IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
SOUTHERN DIVISION

| | | |
|---|---|---|
| JENNIFER CLARK, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 6:14-CV-03413-DGK |
| | ) | |
| GENERAL MOTORS, LLC, | ) | |
| | ) | |
| Defendant. | ) | |

**FINAL ORDER REGARDING SETTLEMENT AND ATTORNEYS' FEES**

This order arises from the Court's approval of a wrongful death settlement. Plaintiff Jennifer Clark alleges a defective ignition switch in the 2005 Chevrolet Cobalt her husband was driving caused his fatal automobile crash. The case was filed in Missouri state court, removed to this Court, transferred to the multidistrict litigation court ("MDL") presiding over all General Motors ignition switch litigation, and then transferred back to this Court for approval of the parties' settlement. Previously, the Court conditionally approved the settlement, withholding approval of the attorneys' fees provision until Plaintiff's counsel submitted supplementary briefing demonstrating that the attorneys' fee and fee contract complied with Missouri Rule of Professional Conduct 4-1.5(a)-(c). J. and Order Conditionally Approving Settlement (Doc. 18) at 5-6. The Court also ordered that all attorneys' fees be paid into the Court's registry pending resolution of this issue. *Id.* at 5.

Now before the Court is Plaintiff's Response to the Court's Order Requesting Supplemental Briefing (Doc. 19). The Court finds the Fee Agreement charging a forty percent contingent fee, or $1,527,728.00, was unreasonable at its inception and when the fee was quantified at the conclusion of the case as judged by the eight factors enumerated in Missouri

Rule of Professional Conduct 4-1.5(a). Consequently, the Fee Agreement is void and unenforceable. Plaintiff's counsel are, however, entitled to a recovery in *quantum meruit* of a reasonable attorneys' fee, which the Court finds is $945,000.00. After paying this award and reimbursing counsel their reasonable costs and expenses, the Court orders that the funds remaining in the registry, $583,238.68, be distributed as follows: Plaintiff Jennifer Clark shall receive $466,590.94, and decedent's parents, Ms. Matney and Mr. Clark, shall each receive $58,323.87.

## Background and Procedural History

On January 12, 2011, Nathan A. Clark ("Decedent") died when the 2005 Chevrolet Cobalt he was driving lost power and careened into a rocky embankment. In April of 2014, his widow, Jennifer Clark[1] ("Plaintiff"), contacted James Rogers ("Mr. Rogers") of the law offices of James S. Rogers ("the Rogers firm") in Seattle, Washington, about representing her in this case.

On April 1, 2014, Defendant General Motors, LLC ("GM") announced that it had hired Kenneth Feinberg ("Feinberg") to advise it on how to handle the ignition-switch defect. *See*, *e.g.*, Neal Boudette, *GM Hires Victims' Compensation Expert Feinberg to Advise on Defect's Impact*, Wall Street J. (Apr. 1, 2014, 3:50 PM), http://www.wsj.com/news/articles/SB10001 4240527023041 57204579475661462153986. GM subsequently employed Feinberg to administer a no fault, non-adversarial, voluntary compensation program ("the Compensation Fund") to settle defective ignition switch claims.

---

[1] The case caption states the Plaintiff's name is Jennifer Clark, but she signed the representation agreement using a different name, Jennifer Hayes. For consistency, the Court refers to her as "Plaintiff."

On May 17, 2014,[2] Plaintiff signed a fee agreement ("the Fee Agreement") with the Rogers firm. In relevant part, the Fee Agreement provides that the attorneys "shall receive as their fee forty percent (40%) of all money recovered." This forty percent was to be calculated on the gross recovery, before deduction of "unpaid costs, medical expenses or payment of subrogation interest." Fee Agreement (Doc. 19-4) at ¶ 1. In the event an appellate specialist would be needed, the Fee Agreement reserves the right to charge an appellate fee of up to an additional five percent. *Id.* at ¶ 1B.

If there was no recovery, the attorneys would receive no fee. Plaintiff, however, was still responsible for all costs and expenses: "If there is no money received on behalf of the Client by settlement or judgment, the Attorneys shall receive nothing for their time and services, *but shall be reimbursed for expenses and costs advanced*." *Id.* at ¶ 1D (emphasis added). "Regardless of whether there is any recovery by settlement or judgement, *the Client agrees to pay the pre-trial and trial costs and expenses that may be incurred* to properly and adequately investigate and prepare" the case for trial. *Id.* at ¶ 2 (emphasis added). These costs include, but are not limited to, expert witness fees, travel expenses, deposition costs, and investigation fees. *Id.*

The Fee Agreement also provides that,

> If the Client elects at any time to abandon this claim or to discharge Attorneys, then in either event Client agrees to pay the law firm at the time and prior to release of the Client's file[3] in this

---

[2] Mr. Rogers signed the agreement later, on May 24, 2014. The record is silent as to where Plaintiff was when she signed the agreement.

[3] This provision that all fees, costs, and expenses must be paid before the attorneys will release the client's file may not comply with Missouri Rule of Professional Conduct 1.16. *See* Mo. Bar Formal Op. No. 115, Attorney May Not Withhold Property Belonging to His Client to Enforce Payment of Fees or Expenses (Mar. 4, 1988), https://www.courts.mo.gov/file.jsp?id=44620 (noting the client's file belongs to the client "from cover to cover" and that an attorney may not withhold a client's file to enforce the payment of fees or expenses). While not at issue in this case, the inclusion of this provision in the Fee Agreement reinforces the Court's concern that Mr. Rogers—whose practice is based in Washington state—may not be familiar with Missouri's ethical rules.

3

> matter, a reasonable fee for services performed to date of such
> discharge or abandonment, which shall be computed at the rate of
> up to Four Hundred and Ninety-Five Dollars ($495.00) *per hour*
> for services rendered by James S. Rogers, up to Three Hundred
> and Twenty-Five Dollars ($325.00) *per hour* for services rendered
> by associate attorneys, up to One Hundred Seventy-Five Dollars
> ($175.00) *per hour* for services rendered by paralegals, and to
> reimburse all costs and expenses advanced by Attorneys in
> connection with Client's claim. Client hereby grants Attorneys a
> lien on Client's claim and causes of action, and any proceeds in
> any judgments or settlements under it in an amount equal to the
> sums incurred as Attorneys' fees, costs and disbursements.

*Id.* at ¶ 10 (emphasis added).

On June 30, 2014, the Compensation Fund released the final protocol it would use to review and analyze claims. Among other things, it stated that claims must be filed between August 1 and December 31, 2014, and that a claimant had to submit documentation demonstrating causation and damages, and it specified the acceptable documentation. Final Protocol for Compensation (Doc. 14-1) at 4, 7-10. It also specified the acceptable documentation for a claim. *Id.* at 7-9.

On August 4, 2014, Plaintiff signed an addendum to the contract adding Robert Palmer ("Mr. Palmer"), an attorney with the PalmerOliver, P.C. ("PalmerOliver") law firm in Springfield, Missouri, as local counsel. The addendum confirmed that the fee was a forty percent contingency fee, with seventy-five percent going to the Rogers firm and twenty-five percent to PalmerOliver. Addendum (Doc. 19-4) at 4.

Plaintiff signed both the original agreement and the addendum on behalf of herself and Decedent's parents, Kathy Matney ("Ms. Matney") and Albert Allen Clark ("Mr. Clark"). Plaintiff confirmed during the May 29, 2015, settlement hearing that she, Ms. Matney, and Mr. Clark (all three collectively "the Claimants") all understood and agreed to this fee.

4

Represented by the Rogers firm and PalmerOliver, Plaintiff sued GM in Missouri state court on August 8, 2014. Shortly after filing suit, Plaintiff's counsel submitted a claim to the Compensation Fund. To support it, they submitted police reports from the accident and expert reports suggesting that the ignition switch more likely than not caused the accident. The Compensation Fund twice rejected Plaintiff's claim, stating that there was insufficient documentation to prove causation. In response, her attorneys located the Cobalt's previous owner and police reports proving the Cobalt had previously experienced ignition switch issues. The Compensation Fund approved Plaintiff's claim on March 18, 2015, offering a gross settlement of $3,819,320.00.

On May 29, 2015, the Court held a hearing pursuant to Mo. Rev. Stat. § 537.095.1 to decide whether to approve the proposed settlement and distribution of the settlement funds. At the hearing, the Claimants testified that they are the only individuals entitled to sue under Missouri's wrongful death statute. They further testified that they understood all the risks and benefits of settling.

The Claimants also voiced approval of distributing the money as called for in the Fee Agreement and addendum. This requires first distributing forty percent of the gross settlement amount, $1,527,728.00, to the attorneys as a fee.[4] The attorneys would then deduct their costs and expenses, which were $4,786.34 for the Rogers firm and $202.30 for PalmerOliver, from the remaining $2,291,592.00. The balance, $2,286,603.36, would be split between the clients 80%-10%-10%, resulting in Plaintiff receiving $1,829,282.69 and Ms. Matney and Mr. Clark each receiving $228,660.34.

---

[4] The attorneys would split this amount 75%-25%, with $1,145,796.00 going to the Rogers firm and $381,932.00 going to PalmerOliver.

At the conclusion of the hearing, the Court announced it would approve the Settlement. In preparing its written order, however, the Court realized that the existing record was undeveloped with respect to the attorneys' fees and expenses. The record clearly showed that the Claimants had agreed to a forty percent fee, but it was unclear whether collecting a $1.5 million fee in this particular case complied with Missouri Rule of Professional Conduct 4-1.5(a)-(c), which prohibits charging or collecting an unreasonable fee. The Court was particularly concerned whether the amount of time and labor spent on the case could justify collecting a $1.5 million fee. Consequently, the Court conditionally approved the Settlement, ordered a partial distribution to the Claimants, and ordered the Claimants to pay the attorneys' fees and expenses into the Court's registry. The Court also ordered Plaintiff's counsel to "submit additional briefing and documentation demonstrating how this fee is reasonable in light of the factors stated in Rule 4-1.5(a)." J. and Order Conditionally Approving Settlement at 5. The Court specifically instructed counsel to document the hours worked and the tasks undertaken in conjunction with this representation.[5] *Id.*

In response, Plaintiffs' attorneys have filed a brief arguing that a forty percent contingency fee in a wrongful death/products liability case is standard practice and reasonable. They state that they did not keep track of their billable hours in this case, that they never keep track of their billable hours in such cases, and that not keeping track of hours is standard practice for plaintiffs' attorneys in such cases. Rogers Aff. (Doc. 19-5) at 2. They state they have no idea how much time they had spent on this case, nor can they provide an estimate: "In fact,

---

[5] The Court sought written submissions to ensure that counsel had ample opportunity to make a complete record and to avoid counsel traveling back to Kansas City to provide information that could be submitted via affidavits, time records, and other documentation. Counsel have submitted additional briefing and exhibits, including more than thirty-four exhibits, and they have not identified any other information they wanted to place on the record which could not be submitted in writing. Accordingly, Plaintiff's request for a second hearing, Br. at 10, is denied as unnecessary.

plaintiff's counsel would be extremely uncomfortable even trying to reconstruct their hours as it would be merely guesswork at this stage." Pl.'s Resp. (Doc. 19) at 2-3; Rogers Aff. at 2 ("[W]e cannot make a guess of total hours worked").

Attached to the brief are numerous exhibits. Chief among these are affidavits from thirty-two plaintiff's attorneys who routinely prosecute similar automotive products-liability defect cases. Many of the affiants have represented, or are currently representing, plaintiffs in GM ignition switch litigation and have experience submitting claims to the Compensation Fund.

These affidavits can be summarized as follows: The affiants state that their firms charge a forty to fifty percent contingency fee in these cases. A few observe the percentage charged is partially "dependent upon the timing of the conclusion of the case." *E.g.* Langdon Decl. (Doc. 19-2) at 1. The affiants uniformly state that their firms never keep track of the hours worked on such cases because there is no reason to do so. *See, e.g.*, Robb Aff. (Doc. 19-2) at 3, ¶ 6 (asserting there is "no lawful, ethical or practical reason" for plaintiff's counsel to keep track of their hours worked). They contend a forty to fifty percent fee is justified because these cases can require enormous amounts of capital—as much as $500,000—to prosecute. They also note these cases are extremely risky to prosecute because there is "the possibility of completely losing all of the money invested in case expenses" since the client is not obligated to reimburse them for costs and expenses unless there is a recovery. *E.g.* Langdon Decl. at 1. Further, they observe that providing sufficient documentation to settle a claim via the Compensation Fund is difficult and onerous. Finally, the affiants praise Mr. Rogers and Mr. Palmer's skill and professionalism.

These affidavits are generally informative, but of limited usefulness in determining whether the proposed fee in this particular case is reasonable. None of the affiants appear to have read the Fee Agreement or have any familiarity with the facts and circumstances of this

case. Moreover the format, organization, and sometimes even wording of these affidavits are similar. *Compare, e.g.,* Bethune Aff. (Doc. 19-2) at 7, ¶ 2 ("These are not intersection collision cases where a lawyer writes a letter to an insurer, gets limits offered and takes a 1/3 fee."), *and* Gentile Aff. (Doc. 19-2) at 9, ¶ 2 ("These are not intersection collision cases where a lawyer writes a letter to an insurer, gets limits offered and takes a 1/3 fee."), *with* Rhodes Aff. (Doc. 19-2) at 11, ¶ 2 ("These are not intersection collision cases where a lawyer writes a letter to an insurer, gets limits offered and takes a 1/3 fee—many times making thousands of dollars per hour with zero risk and no real effort."). This makes them somewhat less persuasive.

Mr. Rogers and Mr. Palmer have also submitted affidavits describing the work they performed in this case (Doc. 19-5 at 12-16, 20-21, 23-24; Doc. 19-6 at 1-3; Doc. 19-7 at 2-4). Their work largely consisted of gathering evidence sufficient to persuade the Compensation Fund that a defective ignition switch caused the accident. It also included: communicating with the Claimants; drafting and filing the five-page Petition; filing a plaintiff's fact sheet and other documents in the MDL; participating in telephone conferences discussing MDL discovery procedures; reviewing the settlement documents; transferring the case back to this district for settlement approval; participating in the wrongful death settlement hearing; and responding to the Court's requests for additional information. Palmer Aff. (Doc. 19-6) at 1-2. But they did not take any depositions, conduct any substantive motion work, or try the case.

## Standard

As noted in the Court's prior order conditionally approving the settlement, a wrongful death settlement requires court approval. *See* Mo. Rev. Stat. § 537.095.1. With respect to awarding attorneys' fees, the statute provides that "[t]he Court *shall order* the claimant: . . . (2)

To deduct and pay the expenses of recovery and collection of the judgment and the attorneys' fees as contracted." *Id.* § 537.095.4(2) (emphasis added).

Although the Court must order the distribution of attorneys' fees "as contracted," a "contract or transaction prohibited by law is void." *White v. Med. Review Consultants, Inc.*, 831 S.W.2d 662, 665 (Mo. Ct. App. 1992) (Fenner, J.). Missouri's Rules of Professional Conduct have the force of law. *In re Ellis*, 221 S.W.2d 139, 141 (Mo. 1949). Hence the Fee Agreement is void if it violates Rule 4-1.5. *See Eng v. Cummings, McClorey, Davis & Acho, PLC*, 611 F.3d 428, 435 (8th Cir. 2010) (holding a fee-splitting agreement was unenforceable as a matter of law because it violated Missouri Rule of Professional Conduct 1.5(e)).

## Discussion

Attorneys' fees must be earned. *See Neilson v. McCloskey*, 186 S.W.3d 285, 287 (Mo. Ct. App 2005) (noting that to be entitled to a given fee, attorneys must perform an appropriate share of work or assume a share of the financial risk and ethical responsibility). The question in this case is whether collecting a $1,527,728 fee under the circumstances of this case violates Rule 4-1.5(a)'s prohibition on charging or collecting an unreasonable fee.[6] The question is not whether collecting a forty percent fee is reasonable in a typical automotive crashworthiness case; the question is whether collecting a $1,527,728 is reasonable under the circumstances of this *particular* case. *See McCoy v. The Hershewe Law Firm, P.C.*, 366 S.W.3d 586, 597 (Mo. Ct. App. 2012) (observing a fee's reasonableness varies "on a case-by-case basis depending on the circumstances").

---

[6] Rule 4-1.5(b)-(c) also apply here, but since the Fee Agreement explained in writing the scope of the representation, that the fee was contingent on the outcome, and that the clients would be liable for all expenses regardless of the outcome, it complied with subsections (b) and (c).

9

"The factors to determine the reasonableness of a fee are laid out in Rule 4-1.5(a) of the Missouri Rules of Professional Conduct." *Tobin v. Jerry*, 243 S.W.3d 437, 443 (Mo. Ct. App. 2007). It states:

> (a) A lawyer shall not make an agreement for, charge, or collect an unreasonable fee or an unreasonable amount for expenses. The factors to be considered in determining the reasonableness of a fee include the following:
>
> > (1) the time and labor required, the novelty and difficulty of the questions involved, and the skill requisite to perform the legal service properly;
> >
> > (2) the likelihood, if apparent to the client, that the acceptance of the particular employment will preclude other employment by the lawyer;
> >
> > (3) the fee customarily charged in the locality for similar legal services;
> >
> > (4) the amount involved and the results obtained;
> >
> > (5) the time limitations imposed by the client or by the circumstances;
> >
> > (6) the nature and length of the professional relationship with the client;
> >
> > (7) the experience, reputation, and ability of the lawyer or lawyers performing the services; and
> >
> > (8) whether the fee is fixed or contingent.

The application of these factors varies on a case-by-case basis depending on the circumstances. *McCoy*, 366 S.W.3d at 597. Each factor is not relevant in every case, and the trial court is vested with "the discretion to evaluate these factors according to the particular circumstances of each case." *Id.*

Apart from these eight factors, Missouri caselaw provides no guidance on how to determine whether a contingency fee is reasonable in a particular case. But some states which, like Missouri, have adopted the American Bar Association's ("ABA") model rule 1.5(a)

10

governing attorneys' fees,[7] use a two-part test. *See, e.g., Brown & Strum v. Frederick Rd. Ltd. P'ship*, 768 A.2d 62, 79 (Md. App. 2001). They first determine whether the agreement was "reasonable in principle when the parties entered into it." *Id.* Second, at the conclusion of the case when the fee is quantified, they examine whether the agreement "was reasonable in operation" as determined by the eight factors above. *Id.* Both parts of the test must be satisfied. *Id.* Because this test is well-reasoned and has been used successfully in other jurisdictions, the Court holds the Missouri Supreme Court would likely embrace it. Consequently, the Court applies it here.

The Court has considered—and rejected—counsels' suggestion that it should consider only whether the fee agreement was reasonable at the time it was made. Br. at 10. Proponents of this position argue that if the court considers what happened after the agreement was reached, the court is no longer examining the fee agreement for reasonableness; rather, it is writing a new contract for the parties based on 20-20 hindsight. *See* Ronald D. Rotunda & John S. Dzienkowski, *Legal Ethics – The Lawyer's Deskbook on Professional Responsibility* § 1.5-1(c) (2015-2016 ed.). This position is not persuasive, however, because even its proponents acknowledge that sometimes the court must consider subsequent events in determining whether a contingent fee is reasonable. *Id.* ("The court should *normally* look at the fee agreement as of the time it was made," but "[i]n some cases a change in circumstances may make a fee agreement, in retrospect, unreasonable" (emphasis added)). As the Supreme Court of Arizona observed, even if the fee agreement is reasonable when struck, this does not "give[] the lawyer carte blanche to charge the agreed percentage regardless of the circumstances which eventually develop. Either a fixed or contingent fee, proper when contracted for, may later turn out to be excessive." *In re*

---

[7] The ABA's model rule 1.5(a) is identical to Missouri's Rule 4-1.5(a).

11

*Swartz*, 686 P.2d 1236, 1243 (Ariz. 1984) (citations omitted).[8]  This approach is also incompatible with the text of Rule 4-1.5(a)(1) since it is impossible for a court to determine "the time and labor required . . . to perform the service properly" or to judge the "results obtained" until *after* the litigation has concluded.

On the facts and circumstances of this case, the Court finds that the forty percent contingency fee here was unreasonable, both at its inception and after it was quantified.

## I.      The Fee Agreement was not reasonable at its inception.

The first prong concerns whether the agreement was reasonable in principle when the parties entered into it.

To be clear, the Court is not holding that charging a forty percent contingency fee in a typical automotive crashworthiness case is *per se* unreasonable.  In a typical automotive crashworthiness case, the plaintiff's lawyers expect to, and usually do, spend thousands of hours working on the case.  *See* Gentile Aff. (Doc. 19-2) at 9 ("[These cases] never settle early or without significant work.")  They also reasonably expect to, and often do, advance hundreds of thousands of dollars in costs and expenses which the client will not have to repay if there is no recovery.  The lawyers also reasonably expect to wait several years before receiving any payment.  Given the amount of risk the lawyers reasonably believe they are undertaking at the outset of the representation, a forty percent contingency fee is not inherently unreasonable.

---

[8] Considering only whether the agreement is reasonable at the time it was made could produce an absurd result.  For example, suppose an attorney agrees to represent a client seriously injured in an automobile accident for a thirty percent contingency fee.  At the time the client and attorney reach the fee agreement, both reasonably believe that the defendant has a $100,000 insurance policy, that the defendant will contest liability, and that a thirty percent contingency fee is slightly less than the fee customarily charged in such cases.  Thus, the agreement is reasonable at the time it is reached.  The attorney subsequently spends thirty minutes writing a one-page demand letter to the insurer.  To everyone's surprise, the insurance company immediately agrees to settle for the policy limits.  The attorney then collects a $30,000 fee.  The attorney's conduct would be ethical under this test because the fee agreement was reasonable at the time it was made.  But collecting $30,000 for one-half hour of work is not reasonable.  And such a fee would not be judged ethical under the two-part test employed by the Court, since the fee agreement would not "be reasonable in operation."

12

This case was distinguishable from the typical crashworthiness case at its inception for two reasons, both of which reduced the risk counsel faced. First, the Fee Agreement made the client responsible for repaying the fees and costs advanced even if there was no recovery. None of the thirty-two plaintiff's attorneys who submitted affidavits appear to include such a provision in their fee agreements when they charge a forty percent contingent fee. On the contrary, they cite the risk of losing hundreds of thousands of dollars in advanced fees and costs as a justification to charge a forty percent or higher fee. *E.g.* Ollanik Aff. (Doc. 19-3) at 45, ¶ 7.[9] This provision is noteworthy because it shifted a major component of the financial risk here from the attorneys to the client.

Second, GM announced that it had retained Kenneth Feinberg to advise it on how to resolve the ignition switch problem *before* counsel and the client signed the Fee Agreement. Feinberg's well known expertise lies in creating and administrating victim compensation funds. He administered the compensation funds for the victims of the September 11 terror attacks, the Aurora movie theater massacre, the Virginia Tech shooting, the BP/Deepwater Horizon oil spill, and the Boston marathon bombings, to name a few. *See*, *e.g.*, *Meet Kenneth Feinberg: The Man Who Puts a Price on Pain*, NBC News (May 14, 2013 12:57 AM), http://usnews.nbcnews.com/_news/2013/05/14/18107596-meet-kenneth-feinberg-the-man-who-puts-a-price-on-pain?lite. Given this announcement, counsel should have known at the time they signed the Fee Agreement that GM would probably be creating a compensation fund to resolve defective ignition switch claims. Granted, counsel did not know at the time of the announcement

---

[9] *See also* Gomez Decl. (Doc. 19-3) at 63, ¶ 4 ("If we are unsuccessful, the contingency fee client does not reimburse us for the expenses we advanced on their behalf. Those expenses are lost."); Manners Decl. (Doc. 19-2) at 5, ¶ 5 ("Of course, working on a contingent fee basis, we run the risk that our expenses advanced and time expended may be wholly unrecovered and uncompensated."); Bethune Decl. (Doc. 19-2) at 7, ¶ 3 ("If there is no recovery, then we obviously collect no fee and absorb the loss of the case expenses advanced."); Van Gaasbeck Decl. (Doc. 19-3) at 11 (noting hundreds of thousands of dollars in advanced, unreimbursable expenses can "evaporate without compensation" when a case is lost).

the details of how any compensation fund would work or whether it would ultimately be in the client's best interest to settle the claim in such a forum. But they knew a compensation fund was likely in the works.

The creation of such a fund was important because it arguably increased the likelihood that counsel would recover a high fee with little risk. That is, it made it realistically possible for counsel to quickly settle the claim for its full value without facing any increased risk. The worst thing that might happen once a compensation fund was created was that counsel would review the fund's protocol, decide it was not in the client's best interest to attempt to resolve the claim via the compensation fund, and then proceed as counsel normally do in such cases, by actively litigating the case to its resolution. Hence, the Feinberg announcement effectively decreased the risk involved in accepting this case.

To reflect the reduced risk faced here, counsel should have charged a contingency fee lower than the forty percent that is usual and customary in automotive crashworthiness cases. Contingency fees are designed to reflect the risks that lawyers bear in cases where they work at the risk of receive little or no fee. *See* Lester Brickman, *Effective Hourly Rates of Contingency-Fee Lawyers: Competing Data and Non-Competitive Fees*, 81 Wash. U. L. Q. 653, 655-56 (2003). "These higher rates of return, however, are justified under ethical codes and fiduciary principles only if they are commensurate with the risks assumed by lawyers of nonrecovery or low recovery." *Id.* at 656. Where the risk is lower, the contingency fee charged should also be lower. *See id.* at 655-56.

In the present case, the inclusion in the Fee Agreement of the provision requiring repayment of all costs and expenses advanced even if there was no recovery combined with the likelihood that the case could be quickly resolved via a compensation fund significantly reduced

counsel's risk. It reduced it so much that the risk profile here resembled that in an ordinary automotive crash case, where a thirty-three percent contingency is typical. *See* Ollanik Aff. at 45, ¶ 7 ("In simpler types of personal injury cases such as auto collision cases or slip-and-fall cases, contingency fee contracts of 1/3 (33.33%) are common.") Thus, charging a forty percent contingency was not reasonable, and so the Fee Agreement was not reasonable at its inception.

This finding is dispositive because both portions of the two-part test must be satisfied. To aid in any appellate review, however, the Court will also analyze the second prong, whether the agreement is reasonable in operation.

**II.     The Fee Agreement is unreasonable in operation under Rule 4-1.5(a).**

Reasonableness in operation is determined at the conclusion of the case when the fee has been quantified by applying the eight Rule 4-1.5(a) factors. The Court's analysis is as follows.

*1.     The time and labor required, the novelty and difficulty of the questions involved, and the skill requisite to perform the legal service properly.*

With respect to the first factor, the traditional view was that "the time taken to perform the services is only one element to consider and is ordinarily of minor importance." *E.g.*, *Scott v. Home Mut. Tel. Co.*, 510 S.W.2d 793, 795 (Mo. Ct. App. 1974). Recently, however, Missouri courts have given more weight to the time and labor required to perform the service, recognizing that where the attorneys' services "were preliminary, not complex, and were not a substantial contributing factor to the end result, a focus on the time and amount of services may be more appropriate than focusing on other factors." *See McCoy*, 366 S.W.3d at 597 (discussing this factor in the context of a quantum meruit award). Plaintiff's counsel report they do not know how much time they spent on this matter. They state that, like their peers, they do not keep track of their hours in these cases. They intimate there is no reason to do so, and that reconstructing their time spent on this case would be impossible. Pl.'s Resp. at 2-3. In terms of the novelty and

difficulty of the questions involved, counsel observe that persuading the Compensation Fund to approve a claim is a difficult and onerous process, and that they had to perform an in-depth investigation to convince it that an ignition defect caused the accident. They do not discuss the skill required to prosecute this particular case, but observe generally that "the skill required to achieve a successful resolution of a crashworthiness case is far beyond that of an ordinary car accident case where the typical contingency fee in Missouri is 33%." *Id.* at 4.

The Court finds as follows. First, the work performed appears to have been *de minimis* compared to the work performed in a typical automotive crashworthiness case. The Court writes "appears" because counsel have not provided any accounting of the time spent on this case, or even a good-faith estimate. Counsel justify this be arguing that there was no need to keep time records, and they cannot even estimate how much time was spent on this case. However, there was a need to keep hourly time records: the Fee Agreement assumes that counsel will track the attorney and staff hours worked on this case. The Fee Agreement provides that if the client abandons the claim or discharges the attorneys, the client will have to pay the firm a reasonable fee for services rendered. This fee would be determined by the number of hours each attorney or staff member worked on the case multiplied by the applicable hourly rate. This calculation would be impossible to make unless the firm was keeping track of the hours worked, or at least had some mechanism in place whereby counsel could go back and reconstruct the hours worked.

Fortunately, there is sufficient information in the record for the Court to estimate how much time was spent on this case. Where the attorneys do not estimate the hours worked on a case, the court may make its own estimate. *See McCoy*, 366 S.W.3d at 598 (observing that because the law firm declined to provide an estimate of the hours worked, it was reasonable for the court to make one). Based on the amount of expenses incurred here, which were less than

$5,000, the work described in the affidavits, and the Court's experience reviewing time and billing records in other civil litigation,[10] the Court estimates the total amount of time spent working on this case—attorneys, paralegals, investigators, and others—did not exceed 450 hours. Indeed, the case settled before counsel could invest a great number of hours in the case. Plaintiff signed the Fee Agreement on May 17, 2014, and the case settled ten months later, on March 18, 2015.

This 450 hour sum has three components. First, the Court estimates the written work and time spent in court—drafting a five-page petition, filing routine papers with the MDL court, reviewing settlement documents, and seeking court approval of the settlement—could not have exceeded 200 hours. Second, significant time was spent on the claim investigation, specifically locating and interviewing the car's previous owner. While this investigation required some diligence, it should not have been inordinately time-consuming. Thus, the Court estimates the amount of time spent on claim investigation did not exceed 200 hours. Allowing an additional fifty hours of work for miscellaneous tasks, such as communicating with the client, the Court finds the total amount of time spent on this case could not have exceeded 450 hours.[11]

The time expended on this case was dramatically less than that typically expended in an automotive crashworthiness case. As made clear by the affidavits, these cases typically require plaintiff's counsel to invest thousands of hours in the case, advance hundreds of thousands of dollars in expenses which may never be reimbursed, and wait several years to be paid. But this case is unlike the typical case described in the affidavits. Here counsel spent no more than 450

---

[10] Under Missouri law, trial courts are experts on the question of attorneys' fees. *Berry v. Volkswagen Grp. of Am., Inc.*, 397 S.W.3d 425, 430 (Mo. 2013); *McCoy*, 366 S.W.3d at 596.

[11] Granted, this is an estimate of the time and labor required here. While the Court has attempted to make the most accurate estimate possible, erring on the side of over estimating the number of hours worked, it is possible this estimate could be too low. Although counsel are correct that the failure to keep contemporaneous time records is not unreasonable *per se*, this case illustrates the potential pitfalls for plaintiff's attorneys of not keeping any accounting of their time.

hours on the case, advanced less than $5,000 in expenses (which the client was obliged to repay even in the event of a loss), and did not have to wait very long to receive payment, even including the time it has taken for the Court to approve the attorneys' fees portion of the settlement. Thus, the work performed and risk undertaken here were markedly less than that involved in the typical products-liability crashworthiness case.

Assuming the law firms invested 450 total hours in this case, collecting a $1,527,728.00 fee is equivalent to charging a blended rate of $3,395 an hour.[12] This rate is more than six times Mr. Rogers' hourly rate, and much of the work here was probably performed by paralegals, investigators, or associates, whose hourly rates are much lower. "Contingency fees are designed to—and do—yield higher effective hourly rates than do hourly rate fees to reflect the risks that lawyers bear." Brickman, *supra* at 655-56. But effectively charging a blended rate that is a six times the highest possible hourly rate is not justifiable given that this was not a demanding case and counsel did not assume an enormous risk in undertaking the representation.

Second, with respect to the novelty and difficulty of the questions involved, aside from the inherent difficulty of proving an automotive defect, the only novel or difficult issue here was navigating the Compensation Fund's claim process. And while the claim documentation requirements were somewhat onerous, the Compensation Fund provided a venue for a swift and efficient resolution of this case. On balance, the Compensation Fund's existence made counsel's job easier. Absent the Compensation Fund, counsel would likely have been forced to litigate the case for several years to achieve a substantially similar result.

Third, rendering the legal service here did not require great skill. The most important work here was locating and interviewing the Cobalt's previous owner. This required the services

---

[12] Even if the Court wildly underestimated the number of hours worked on this case, and the firms had actually spent twice as much time—900 hours—on it, the effective hourly rate would still be almost $1,700 an hour.

of a skilled investigator, not a skilled attorney. The service rendered by Plaintiff's counsel was ushering Plaintiff's claim through the Compensation Fund and being prepared to litigate the case if the Compensation Fund rejected the claim or offered an unsatisfactory amount. This was accomplished by locating and interviewing of the car's previous owner, at which point the attorneys had the information necessary to get the claim approved or successfully litigate the case. While navigating the claim process required counsel to draw on some general experience as attorneys and some experience in crashworthiness cases, it is unclear whether it required any specialized or unusual skill. Finding the previous owner (or supervising an investigator's efforts to find the previous owner) required little legal skill.

Accordingly, the Court finds the first factor weighs heavily against the reasonableness of a $1,527,728.00 fee.

2. *The likelihood, if apparent to the client, that the acceptance of the particular employment will preclude other employment by the lawyer.*

As for this factor, counsel writes, "Working on [this] case was a commitment that precluded work on other cases, as all cases require." This conclusory statement is not persuasive. There is no evidence here that accepting Plaintiff's case did, in fact, preclude counsel from working on other cases, particularly since counsel performed relatively little work on the case and it settled very quickly. Assuming that it did preclude counsel from working on other cases, there is no suggestion that this was apparent to the client. Thus, this factor weighs against the reasonableness of charging a forty percent fee.

3. *The fee customarily charged in the locality for similar legal services.*

Counsel suggest that the relevant market for automotive product liability cases is a nationwide market, and that the standard fee charged in these cases is a forty percent contingency. They cite the affidavits for support. In fact, the affidavits suggest that the fee

19

customarily charged for similar services ranges is actually higher, from a low of forty percent to a high of fifty percent, thus the proposed fee is on the lower end of the fee-range continuum. The affidavits also establish, however, that in these cases the client is not normally responsible for repaying the costs and expenses advanced when there is no recovery. Since making the client responsible regardless of the outcome reduces the law firm's potential risk, a lower contingency fee is appropriate.

Also, some of the affiants note that the percentage charged in these cases is partially "dependent upon the timing of the conclusion of the case." Where, as here, a case accepted on a contingency fee basis settles very quickly, these affiants will charge the client a lower percentage than that specified in the fee agreement. Since this case was resolved fairly quickly, a lower percentage should apply.

On balance, these factors weigh in favoring of collecting a lower fee than is customarily charged for similar legal services.

> 4. *The amount involved and the results obtained.*

Counsel write that the result obtained here is "exceptional" for the death of a twenty-nine year-old man, but they do not explain how they reached this conclusion or why this is true.

It appears that the result here was less of a result of counsel's efforts than simply a function of what the Compensation Fund offered to any approved claim. The Compensation Fund paid individual death claims based on one of two methodologies, a presumptive compensation approach that was relatively simple and required submitting limited economic data, but produced payment within ninety days, or a more intensive, complete economic analysis that considered a host of factors and anything else the claimant believed the Compensation Fund should consider. Final Protocol for Compensation (Doc. 14-1) at 4-6. Based on the fact that the

claim was paid within ninety days, it appears Plaintiff's claim utilized the former methodology. Thus, the attorneys' skill and experience did not significantly factor into the compensation offered.

That said, the gross settlement amount here was large, $3,819,320.00, and the net settlement amount was also good, $2,286,603.36. This was a favorable result for the Claimants, although Plaintiff's counsel's skills or efforts do not appear to have played a significant role in determining the amount.

Although there was a good result here, the fact that Plaintiff's counsel was not particularly responsible for it leads the Court to weigh this factor neutral in the analysis.

5.    *The time limitations imposed by the client or by the circumstances.*

Counsel suggest that after they received two deficiency letters from the Compensation Fund, they faced limited time to have the case declared "eligible" by the fund.

While there were time limitations here, it is unclear whether they were caused by the client, the circumstances, or some other factor, such as counsel's failure to submit more complete documentation initially, or the Compensation Fund imposing arbitrary deadlines. In any event, the Court finds that time limitations are not a significant factor in the analysis.

6.    *The nature and length of the professional relationship with the client.*

Counsel do not appear to have had any relationship with the Claimants prior to this matter. The representation was limited to the single accident, and this matter was resolved within ten months. Counsel report that during this representation, the Rogers firm was in "regular and frequent contact" with the Plaintiff to explain the various proceedings, obtain information, and gather client held records. Pl.'s Resp. at 7. They also report that after being associated with this case in August of 2014, PalmerOliver had "multiple contacts" with the

Claimants to meet and sign various documents and discuss the progress of the case. *Id.* The Court also notes that during the May 29 hearing, the Claimants appeared happy with the representation provided. Thus, although the nature and length of the professional relationship was brief and limited to one representation, it was a positive one. This factor weighs in favor of the fee's reasonableness, but is not given significant weight in the overall analysis.

       7.     *The experience, reputation, and ability of the lawyers performing the services.*

Counsel's experience, reputation, and ability are first-rate. The question is how much weight to give this factor. This factor would weigh in favor of the reasonableness of charging a higher fee *if* the attorneys' experience, reputation, and abilities were in some meaningful way responsible for the outcome here. If, for example, there were no Compensation Fund and GM had recognized that because of Plaintiff's counsels' superior skills and abilities, defending the case would be pointless and expensive, and so quickly agreed to a $3.8 million dollar settlement, then a higher fee would be justified. Even though the attorneys performed little work on the case, their experience, reputation, and abilities would have directly contributed to the outcome and so justified the fee. But that is not the case here. Although the Court recognizes counsel are experienced in automotive crashworthiness cases, this does not justify collecting a forty-percent fee on the facts of this case.

Accordingly, while this factor weighs in favor of a higher fee, on the facts of this particular case, it is given little weight in the overall analysis.

       8.     *Whether the fee is fixed or contingent.*

Counsel argues the fee was contingent. While this is strictly speaking correct, the Court notes the Fee Agreement required the clients to reimburse the firm for all costs and expenses even if there was no recovery. Thus, while the fee was contingent, the firms were partially

insulated from the risk of losing hundreds of thousands of dollars in advanced expenses if there was no recovery. The risk assumed by the firms here was analogous to that faced in a typical automotive crash case, where the risk is less and a thirty-three percent contingency fee is standard.

>*Charging a $1,527,728.00 fee is not reasonable under the circumstances.*

In weighing the Rule 4-1.5(a) factors in the context of unique circumstances here,[13] the Court finds that three of the eight factors—the first, second, and third—weigh strongly against the reasonableness of collecting a forty percent, $1,527,728.00 fee here. The remaining factors are all neutral or given little weight in the analysis because of the circumstances of this case. By way of comparison, a recovery equivalent to thirty-three percent of the gross recovery is the largest percentage the Court has authorized collecting[14] in a contingent fee case where the attorneys spent relatively little time on the matter, the case did not involve any difficult questions or require any special expertise, the attorneys did not take on inordinate risk in undertaking the representation, and the case settled quickly with a good result for the client. Accordingly, the Court holds the proposed fee is unreasonable under Rule 4-1.5(a), and the Fee Agreement is void and unenforceable.

---

[13] The Court reiterates that the facts of the present case are very different from the typical automotive crashworthiness case. The attorneys spent relatively little time on the matter in comparison to the proposed fee, the clients were responsible for reimbursing all costs and expenses advanced regardless of the outcome, and the case settled very quickly.

[14] The Court uses the word "collecting" because although a contingent fee agreement might allow the attorney to charge a higher percentage, counsel will often voluntarily choose to collect a lower percentage if the case settles quickly or requires less work than anticipated. *See, e.g.,* Memorandum Regarding Wrongful Death Settlement Approval at 1, *Spalding v. Emp'rs Mut. Cas. Co.*, No. 4:14-cv-0824-DGK (W.D. Mo. Oct. 16, 2014), ECF No. 8 ("The fee agreement allows for a 33% contingent fee. Due to the relatively quick nature of the resolution, plaintiff's counsel agreed to reduce his fee from 33% to 22%, or from $222,750 to $150,000.")

**III.     Plaintiff's counsel is entitled to a recovery in quantum meruit for their services.**

The question then becomes to what fee, if any, is Plaintiff's counsel entitled?  Where a contingency fee agreement is void or was not properly entered into, the attorney may not recover under the agreement.  *See Tobin*, 243 S.W.3d at 441; R. A. Horton, *Attorney's Recovery in Quantum Meruit for Legal Services Rendered Under a Contract Which is Illegal or Void as Against Public Policy*, 100 A.L.R.2d 1378 Art. 1, § 2 (2015).  The attorney may, however, recover in *quantum meruit* if the services rendered were otherwise compensable and not intrinsically illegal or contrary to public policy.[15]  *See Tobin*, 243 S.W.3d at 441; Horton, *supra*. Here, although the proposed fee is unreasonable, the services rendered were "otherwise compensable" and not "intrinsically illegal" or violative of public policy, so counsel is entitled to an award in *quantum meruit*.

To determine what constitutes a reasonable attorneys' fee value in *quantum meruit*, a court must consider: (1) the time, nature, character, and amount of services rendered; (2) the nature and importance of the litigation; (3) the degree of responsibility imposed on, or incurred by, the attorney; (4) the amount of property or money involved; (5) the degree of professional ability, skill, and experience called for and used; and (6) the result achieved.  *McCoy*, 366 S.W.3d at 597.  The application of these factors varies on a case-by-case basis, and the law vests the trial court with the discretion to evaluate these factors under the circumstances of the case. *Id*.  The award may be enhanced to take into account other relevant factors, such as the benefit to the client or the fact that the recovery of any fee was contingent on a successful conclusion to the litigation.  *Id.* at 601.  Of course, "the services must have enriched the client in the sense of benefits conferred" from the lawyers' efforts. *Int'l Materials Corp.*, 824 S.W.2d 890, 895 (Mo.

---

[15] Although the Court would prefer to simply adjust the contingent fee downward to a reasonable level, it can find no caselaw supporting such an approach.

1992). Finally, Missouri law recognizes that opinions can "easily differ" on the value of legal services rendered, and it reasons that the trial judge is the one best positioned to determine a *quantum meruit* award. *McCoy*, 366 S.W.3d at 601.

Applying these factors to the present case, the Court finds:

First, the time, nature, character, and amount of services rendered was comparatively minimal for an automotive crashworthiness case and required average legal skill. The amount of time here involved no more than 450 hours. The legal skill here involved investigating the client's claim and submitting the results to the Compensation Fund. Neither of these tasks were arduous or involved a substantial amount of time or effort.

Second, this representation was of the utmost importance because it concerned a wrongful death claim worth millions of dollars.

Third, the degree of responsibility imposed on the attorney was substantial, but less than that typically incurred by an attorney in an automotive crashworthiness case. It was substantial in that counsel bore ultimate responsibility for prosecuting and settling an important claim. But it was less than typically incurred in such cases because the Compensation Fund settled this case fairly quickly on generous terms, thus counsel was never placed in a position where it had to make a particularly difficult decision. For example, this case did not involve a defendant who engaged in no-holds-barred litigation for three years before making a barebones settlement offer on the eve of trial, thus placing counsel in the position of having to decide whether to recommend a marginal settlement to the client.

Fourth, the amount of money involved was substantial, almost four million dollars.

Fifth, the degree of professional ability, skill, and experience "called for and used here" was not out of the ordinary. While counsels' skills and abilities are generally first-rate, this case

25

did not require them to use these skills. While counsel drew on their general experience with such claims to competently investigate Plaintiff's claim and recognize that the Compensation Fund's settlement offer was in her best interest, this case did not involve the application of any specialized or unusual legal skill.

Sixth, the result achieved here was good—the gross settlement amount was large, $3,819,320.00, and the net settlement amount was also healthy, $2,286,603.36. That said, Plaintiff's counsel's skills or efforts do not appear to have played a significant role in determining the amount.

Consequently, the Court calculates the *quantum meruit* award as follows. All the work performed on this case (legal, paralegal, secretarial, etc.) totaled 450 hours. To ensure the firms are fully compensated, the Court applies a generous blended hourly rate of $350 an hour to compensate them for this work. This yields $157,500.00. However, this amount fails to account for the fact that this case was taken on a contingency fee basis and involved a matter of great importance, some responsibility, and a substantial amount of money. Consequently, the Court enhances this amount by a factor of six.[16] This yields a total *quantum meruit* award of $945,000.00.

Accordingly, the Court approves awarding Plaintiff's counsel a *quantum meruit* fee award of $945,000.00, to be divided among counsel as outlined in the addendum, with seventy-five percent, $708,750.00, going to the Rogers firm and twenty-five percent, $236,250.00, going to PalmerOliver.

As of December 9, 2015, the amount held in the Court's registry totaled $1,533,227.32, including accrued interest. After deducting the fee award and the Rogers firm and PalmerOliver's reasonable costs and expenses, which are $4,786.34 and $202.30 respectively,

_____

[16] The Court recognizes that this is an unusually high multiple to apply and that its application is an outlier.

the amount remaining is $583,238.68.  The Court orders this money be distributed among the Claimants 80%-10%-10%, with Plaintiff receiving $466,590.94 and Ms. Matney and Mr. Clark each receiving $58,323.87.

## Conclusion

For the foregoing reasons, the Court REJECTS the settlement as written and ORDERS the settlement proceeds paid into the Court's registry to be distributed as follows:

$708,750.00 to the Rogers firm as attorneys' fees
$4,786.34 to the Rogers firm as reimbursement for fees and expenses
$236,250.00 to PalmerOliver as attorneys' fees
$202.30 to PalmerOliver as reimbursement for fees and expenses
$466,590.94 to Plaintiff Jennifer Clark
$58,323.87 to Kathy Matney
$58,323.87 to Allen Clark

Counsel shall submit the settlement release forms within fourteen days, after which the Court will enter a final approval and a dismissal with prejudice.

**IT IS SO ORDERED.**

Date:   December 9, 2015                    /s/ Greg Kays
                                           GREG KAYS, CHIEF JUDGE
                                           UNITED STATES DISTRICT COURT

Case 6:14-cv-03413-DGK   Document 23   Filed 12/09/15   Page 27 of 27